ISOM *et al. v.* CANEDY *et al.*

[88 South. 485, No. 21698.]

1. WILLS. *Evidence sufficient to make question of undue influence for jury, and to support verdict for contestants.*

In a suit to establish and probate a will where a *caveat* is filed and where the will has not already been probated in common form, and where the court grants a peremptory instruction for the proponents as to capacity to make a will, and as to the signing and witnessing of the instrument, but submits to the jury the question as to whether the will was or was not the product of undue influence, proof that the proponents were the business partners and that they had the

confidence of the testator, and that one of them married the
daughter of the testator's wife, and that they had caused or en-
couraged an estrangement between the testator and his sons, and
had kept or aided in keeping the sons from visiting the father, and
that the testator was in feeble health and mentally weak from dis-
ease, and that proponents accompanied the testator to the office
where the will was made, with proof of expressions by the testator
prior to the estrangement that he intended to leave his property to
his wife and sons, will authorize the court to submit to the jury the
question of undue influence and will sustain a verdict for the con-
testants.

2.  Wills.  *Exclusion of evidence of attorney drawing held harmless in
    will contest where proponents granted peremptory instruction.*
    Where the proponents of a will tender the evidence of the attorney
    who drew the will as to capacity of the alleged maker of the alleged
    will, and such evidence is excluded, it will be harmless error where
    the court grants the proponents of the alleged will a peremptory in-
    struction on said issue.

3.  Wills.  *Burden of proof in will contest stated.*
    In a will contest in solemn form, the burden of proof is on the pro-
    ponents as to the capacity of the maker to make a will, and as to the
    formal execution, and as to an issue of undue influence, but, on making
    proof of the due execution of the will and the proof of mental capacity
    to make a will, the proponents make out a *prima-facie* case, and it de-
    volves upon contestants to produce proof to rebut the proof so
    made; but, when the contestants produce proof which tends to dis-
    prove the proponent's case, the burden of proof is then on the pro-
    ponents to establish the issue involved by a preponderance of the
    evidence.

4.  Wills.  *Jury may consider disposition of property, confidential rela-
    tions, and mental and physical condition of testator in determining
    undue influence; jury sole judges as to undue influence.*
    Where the evidence supports the hypotheses, it is proper to instruct
    the jury for the contestants that, in determining the question of the
    existence of undue influence operating upon the mind of decedent
    at the time of the making of the alleged will, the jury may take into
    consideration the mental and physical condition of the said decedent
    at and before the alleged signing thereof, that the jury are the
    sole judges as to whether any undue influence was present and oper-
    ated in any way upon the mind of decedent when he signed said
    paper, and, in determining the question of the existence of undue in-
    fluence, the jury may take into consideration the naturalness or un-
    naturalness of the disposition of his property, the relation of trust
    128 Miss.—5

and confidence, if any is shown by the evidence, as between testator and his nephews, the beneficiaries, the fact that a man weak and suffering from disease may be influenced easily by others who bear to him a relation of trust and confidence, any sudden change of testamentary intent, the failure to allow communications between the decedent and his sons, if caused by undue influence of the proponents, as any or all such facts may be shown by the evidence.

APPEAL from chancery court of Coahoma county.

HON. G. E. WILLIAMS, Chancellor.

Proceedings by J. S. Isom and others to probate the will of D. L. Canedy, to which J. A. Canedy and others filed a *caveat.* Judgment for contestants, and proponents appeal. Affirmed.

*Roberson & Yerger, Wells, Stevens & Jones, F. H. Montgomery and J. W. Crisler,* for appellants.

*Maynard & Fitzgerald,* for appellees.

ETHRIDGE, J., delivered the opinion of the court.

This is an appeal from a will contest.

D. L. Canedy on the 7th day of July, 1919, signed an instrument of writing purporting to be a last will and testament which was duly witnessed on said day, and thereafter Canedy died and the instrument was propounded for probate, whereupon the appellees filed a *caveat,* and the issue made by the pleadings in the case was submitted to the jury. At the conclusion of the evidence the court granted a peremptory instruction as to the capacity of the decedent to make a will, but submitted to the jury the question as to whether the will was procured by undue influence.

The proponents produced a number of witnesses to sustain their position as to the mental capacity of decedent and the execution of the will. For the contestants there was evidence showing that the decedent, Canedy, had often expressed his intention of leaving his property to his wife and two sons. His wife was a second wife, and was not the

mother of the appellees, who are the contestants, and at
the time she married Canedy she had children of her own,
one of whom married one of the proponents of the will. It
is in proof for the contestants that prior to the year
1917 D. L. Canedy lived on his place with his wife and his
two sons, and that their relations were about as har-
monious as those ordinarily existing among people similar-
ly situated.

It appears that the proponents Lackey and Isom moved
on the place of the decedent in the year 1917, and Lackey
took charge of the business of Canedy, they operating a
small store together as partners, that Lackey furnished
some money to go in the business which Canedy needed
at the time, and that Lackey managed the business and
soon acquired great influence over Canedy in conducting
the said business. There is evidence also that Canedy, the
decedent, being in bad health, went to Hot Springs, Ark.,
for his health and while there received a letter from Lackey
stating that Canedy's sons and brother were stealing things
off of Canedy's premises and that thereafter the decedent
ran the boys off his place and had no further relations with
his brother. It was in proof for the proponents of the
will that Canedy's sons were disobedient, unmoral, and dis-
respectful to Canedy, and that they had gotten him into
trouble about an automobile, and he had had to pay out
some fines in court for them.

The will was drawn by Mr. Yerger, a lawyer at Clarks-
dale, Miss., who was offered as a witness to testify to what
transpired at the time he drew the will. Mr. Yerger had
been employed for the proponents who had given him a
deed of trust constituting a lien on the lands owned by
the decedent in his lifetime, and which had been attempted
to be conveyed to the proponents by the will. When Mr.
Yerger was presented objection was made to his testifying
on two grounds: First, because he was the attorney of the
decedent and what transpired was privileged; second, that
he had a contingent interest in the property conveyed by
the will and was disqualified under section 1917, Code of

1906 (section 1577, Hemingway's Code). The court sustained the objection to his testimony, and in the absence of the jury the facts he would have testified to were testified into the record. His testimony was to the effect that Canedy was of sound and disposing mind at the time and that he stated to Mr. Yerger being examined separate and apart from the proponents Lackey and Isom, who accompanied Canedy to Mr. Yerger's office, that the reason he was making the will leaving out his sons, with the exception of a small legacy which he gave them, was because they were disobedient, disrespectful, and trifling and would never amount to anything and would waste his property. Mr. Yerger also testified that he saw nothing to indicate undue influence at the time, and that he did not believe undue influence was used, but testified that he did not know the domestic conditions surrounding Canedy.

A young man who was Mr. Yerger's stenographer and who talked with Canedy prior to Mr. Yerger's talking with him, and who was present during all of the time that the proponents Lackey and Isom were present, testified that they made no statements in his presence at the time to influence Canedy in making the will, but that they came with Canedy and departed with him.

It is insisted by the appellants that there is no evidence warranting the submission of the question of undue influence, and that the appellants ought to have had a peremptory instruction of this question as well as on the question of capacity to execute and the proper execution of the will.

It was in proof that Lackey and Isom were kind to Canedy, and that they would not permit Canedy's sons to visit the place. One of the witnesses was asked:

"Q. Now, I want to know what was their relation, and what, if any, influence they exerted there. Just tell the court. A. Well, yes, sir; anything they requested Canedy to do, he was always willing to do it and did do in the church, in the lodge, and everywhere else. Q. Who, if any person, had complete charge of Canedy's business during

the last four years and a half of his life? A. Oliver Lackey. Q. What, if any, chance in your observation did his two sons have to communicate with or be around him at all? A. Not any. Q. How, if at all, did you ever have any conversation with him at all about his sons? A. Yes, sir; several different times. Q. Now during these conversations what, if anything, he said with reference to the whereabouts of his sons? A. I asked Canedy why he made John [his son] leave the place. He said all of his life, 'Whatever I have when I die will be for my son John.' He never did say very much about his son James Canedy, but he said John—once he had a large forty down there that was—that he was leading executive officer of the Masonic lodge. By the Court: Get back to the conversation. A. I am going to prove now why I said that they had an influence. . . . After Canedy made this boy leave home, I was with him coming up here Sunday, and I said to him, I said, 'Elder, why did you make John leave the place.' He says, 'Well, he is of no service to me there on the place.' I says, 'Well, I think you are doing wrong; I would not make him leave the place; I would let him stay.' He says, 'He can't stay there.' I said, 'Well, of course, it is your place.' I says, 'You are our preacher and then jump up and run them off that way.' I says, 'That shows weakness on your side.' He says, 'Well, then, if he is stealing your stuff like he is stealing mine.' I says, 'Well, did you see him steal anything.' He said 'No.' I asked him how did he know. He said Oliver Lackey told him so, that he was stealing, his uncle his—stealing his corn; 'that is why I drove him off the place.' Q. Now, during this spring and, well, during the time that this boy was excluded from the place, please state to the jury who controlled Dan Canedy's business and his affairs of every kind whether himself or some other persons. A. Oliver Lackey, he controlled it."

Another question and answer:

"Q. What do you mean by saying that the loaning of money is the only influence that you knew they were exer-

cising over the old man? A. I mean when Canedy was, you know, in bad shape, like some of my kinfolks says, you have got the land, and I have got the money, and if you will let me come in and boss I will put my money up. They come in there and began to boss and put their money to work. Q. As far as you could hear from your observation thereof, the relations between these two nephews and the old man, who was the real boss and the guiding hand? A. Oliver Lackey; Oliver suggested; Canedy agreed."

Another witness testified:

"Q. What influence from your observation of them did they exert with Dan Canedy? A. Well, it seems like that they gained his confidence some way as he sided with them in what they said and drove the boys from the place, and also believed that I was interfering with his corn, and so on that way. It seems like he must have believed it because he did believe them. Q. What influence was exercised over Dan Canedy during his lifetime by these two nephews and his wife for him to leave property to them instead of to his two sons, if you know of anything? (Objected to. Overruled.) A. Well, after my brother became ill like he was of course he was a little frenzy; he was not at himself and bound to have been."

Taking the whole evidence on the part of the contestants, we think the jury were warranted in reaching the conclusion that the proponents had acquired a dominant influence over the deceased and exerted it for their own benefit. The evidence for the proponents appears to be the stronger evidence, and, if we were sitting as jurors, we might be inclined to find for the proponents; yet we think there is sufficient evidence for the jury to reach the conclusion that the will was the product of the minds of the proponents Lackey and Isom, and not the product of the mind of Canedy, and that the appellant was not entitled to a peremptory instruction.

We have dealt with this assignment out of order because it went to the whole case.

We will next consider the assignment that the court below erred in excluding the evidence of Mr. Yerger. Mr. Yerger's testimony went principally to the capacity of the testator, and upon this issue the court gave the proponents a peremptory instruction. Therefore as to this issue there could be no harmful error because there was no injury to the proponents. Upon the question of undue influence it seems to us that Mr. Yerger's evidence was of practically no value, as it is entirely negative. In addition to this, another witness, Mr. Yerger's stenographer, testified to the same facts without dispute. So we believe there was no harmful error if there was error at all, in excluding Mr. Yerger's testimony. Having reached this conclusion, we prefer not to pass now upon the question of Mr. Yerger's competency because under the decisions of *Whitehead* v. *Kirk,* 104 Miss. 776, 61 So. 737, 62 So. 432, 51 L. R. A. (N. S.) 187, Ann. Cas. 1916A, 1051, and *Cooper* v *Bell,* 114 Miss. 766, 75 So. 767, and *Helm* v *Sheeks,* 116 Miss. 726, 77 So. 820, this court held and is thoroughly committed to the doctrine that a will comes within the purview of our statute prohibiting one from testifying to sustain a claim against the estate of a decedent, and the question now presented is whether one acquiring a contingent title to the property of the decedent, through whom to perfect his title the will must be established, can testify for that purpose. The will necessarily originated in the lifetime of the decedent. It is true it does not become effective as an instrument of conveyance until death, but with the passage of the soul from the body the title passes from the decedent through his will to the devisees if the will is valid. This question is one that we think ought not to be decided on this record.

It is next assigned that the court erred in refusing certain instructions for the proponents. It is a sufficient answer to this assignment to say that the instructions given for the proponents cover the law sought to be announced in the refused instruction, and there was no error in refusing the refused instruction.

It is next assigned that the court erred in granting each of the instructions given for the contestants. The argument is directed at instructions 3, 4, and 5 for the contestants, which read as follows:

Instruction No. 3: "The court instructs the jury that it is not necessary in this case to show that Daniel Canedy was of unsound mind, but it devolves on Marenda Canedy, Oliver Lackey, and Silas Isom, to show to the satisfaction of the jury that the alleged will of Daniel Canedy was made by him without undue influence."

Instruction No. 4: "The court instructs the jury that in considering their verdict in this cause they may take into consideration the confidential relation, if any, existing between the nephews of decedent and the decedent, in connection with such other facts as may be shown by the evidence tending to show an unnatural disposition of the decedent's property."

Instruction No. 5: "The court instructs the jury, that, in determining the question of the existence or nonexistence of undue influence operating upon the mind of Daniel Canedy at the time of the execution of the alleged will, the jury may take into consideration the mental and physical condition of the said Daniel L. Canedy at and before the alleged signing thereof, that the jury are the sole judges as to whether any undue influence was present and operated in any way upon the mind of decedent when he signed said paper, and, in determining the question of the existence of undue influence, the jury may take into consideration the naturalness or unnaturalness of the disposition of his property, the relation of trust and confidence, if any is shown by the evidence, as between testator and his nephews, the fact that a man weak and suffering from disease may be influenced easily by others who bear to him a relation of trust and confidence, any sudden change of testamentary intent, the failure to allow communications between Canedy and his sons if caused by undue influence of the proponents, as any or all of such facts may be shown by the evidence; and the Court further charges the jury that unless the pro-

ponents, Marenda Canedy et al., have shown by a preponderance of the evidence the absence of any undue influence in the making of said alleged will, or if the evidence on said point is evenly balanced, then it is the duty of the jury to return a verdict for the contestants."

As to instruction No. 3, it is complained that the burden was improperly placed upon the proponents in conflict with the instruction given for the proponents by the court. The court did instruct for the proponents that the burden of proof was upon the contestants to establish undue influence. This, however, is an instruction that the proponents were not entitled to receive; in other words, they got a more favorable instruction than they were entitled to.

In *Sheehan* v. *Kearney,* 82 Miss. 688, 21 So. 41, 35 L. R. A. 102, this court held that the burden was on the proponents both as to testamentary capacity and undue influence, but that the proponents made out a *prima-facie* case by showing the due probation of the will.

In the present case there was no probation, but the proponents made out a *prima-facie* case when they proved testamentary capacity and the due execution of the will as announced by this court in *Moore* v. *Parks,* 84 So. 230. In this case the doctrine is that the burden is on the proponents originally to prove both testamentary capacity and the absence of undue influence, but that the proof of the due execution of a will and the capacity of the testator to make a will raises a presumption that it was voluntarily executed. This is correct where there is no evidence to show undue influence, but when the contestants introduced proof proving or tending to prove undue influence, and the evidence as to this is in conflict, or when the contestant has produced his evidence to sustain his contention, the burden is on the proponents and they must produce a preponderance of the evidence.

In the present case the contestants met the proof arising from the execution of the will, and the proponents must produce enough evidence to satisfy the jury by a preponderance of the evidence that there was no undue influence. It

is complained also of this instruction that it says that it must show to the satisfaction of the jury. Wherever evidence of one party is accepted by the jury, it may be said that the jury is satisfied. It would have been better to have qualified the expression "show to the satisfaction of the jury" by the further expression "by a preponderance of the evidence," but the jury were not misled as to this in the present case because they were fully informed as to that phase of the case in other instructions.

We see no objection to instruction No. 4, above set out. It is argued that there is no evidence of the existence of confidential relations, and it is also insisted that the will was not unnatural in the present case. We think the words "confidential relations" are used in the popular sense, and that the nephews came within the meaning of this term. They were partners and business managers of the decedent in whom he had great confidence.

Instruction No. 5, above set out, is criticized in a number of particulars. The expression "that the jury are the sole judges as to whether any undue influence was present and operated in any way upon the mind of the decedent" is criticized. The objection is addressed largely to the expression "in any way." The jury are to consider whether there was influence, and, if so, to what extent it operated, and the manner of its operation. The instruction does not mean, as we understand it, that any kind of influence would be sufficient to answer the requirement of the law, nor that, if it acted "in any way," that necessarily would be sufficient. The general proposition submitted in the instruction is proper to be considered where it is properly supported by the evidence. The instruction is not in the best of form, in that in some particulars it seems to suggest certain facts by way of argument, but, when properly considered, with all the other parts of the instruction, it does not assume facts, nor does it state facts argumentatively. It is always proper to consider in passing upon questions of undue influence the relations of the parties, what influence one has over another, whether it is persua-

sive or whether dominant. If it is dominant, it is undue.
So long as it is merely persuasive without overcoming the
free agency of the party making a will, it is not undue. Un-
due influence must necessarily be proved largely by cir-
cumstances, by taking one fact in connection with another
fact, and weighing the whole of the surrounding facts in
determining whether or not one person has acquired that
influence which dominates the mind of another.

We think the evidence is such in the case that the several
hypotheses submitted for consideration by the jury in de-
ciding on the question of undue influence finds support in
the evidence, and that, taking this instruction in connec-
tion with the other instructions in the case, there is no re-
versible error.

The other assignments present the same questions in
different language.

The judgment will be affirmed.

*Affirmed.*