## Halford *v.* Hines.

No. 39564 April 11, 1955 79 So. 2d 264

*Corban & Corban,* Fayette; *L. L. Forman,* Meadville; *Laub, Adams, Forman & Truly,* Natchez, for appellant.

*McGehee & McGehee,* Meadville; *Luther A. Whittington, Joseph E. Brown,* Natchez, for appellee.

Roberds, P J.

This is a will contest. The instrument was executed by Joe Dorsey by his mark. Giles J. Halford was the sole beneficiary therein. It is dated October 21, 1944. Joe Dorsey departed this life October 23, 1950. On October 26, 1950, on petition of Halford, the instrument was admitted to probate in common form as the will of Joe Dorsey in Jefferson County, Mississippi. Bruce Hines, a nephew and the next of kind of Joe Dorsey, deceased, filed a contest of the instrument as the will of

Dorsey on the grounds, first, that Dorsey did not have the mental capacity to execute a will, and, second, that he was unduly influenced by Mr. Halford to execute the instrument propounded as his will. Hines filed in Jefferson County a petition asking for the removal of the administration proceedings and the will contest to Franklin County, Mississippi, asserting that Dorsey was a resident citizen of Franklin County at the time of his death, owning some 808 acres of valuable lands therein, and that, under the facts and under Section 495, Miss. Code 1942, the proper venue for the probate proceedings and the will contest was Franklin County. The chancellor, after a hearing, sustained the motion to remove both the probate and the contest proceedings to Franklin County. In the will contest hearing the chancellor directed, as a matter of law, under the proof, that Dorsey had the mental capacity to execute a will, but submitted to the jury the question whether or not Dorsey had been unduly influenced by Halford to execute the document propounded as his will. The jury found that Dorsey had been so unduly influenced and that the instrument was not his last will and testament and a decree was entered accordingly. From that verdict and decree Halford appeals to this Court. No appeal was taken by Hines from the action of the chancellor adjudging that Dorsey had the mental capacity to make a will. That question is not before us except insofar as it bears upon the question of undue influence.

On this appeal Halford contends (1) that the verdict of the jury was against the great weight of the evidence on the issue of undue influence and we should so adjudicate and remand the cause for trial by another jury; (2) that it was reversible error for the trial court to refuse to permit Halford to testify on the merits of the contest, and (3) that the removal of the probate and contest proceedings was also reversible error.

We will deal with the question of undue influence. On that question the jury, by its verdict, necessarily

found that Dorsey was unduly influenced to execute the will. Was there sufficient evidence to justify submission of that question to the jury? There were many witnesses and it would unduly lengthen this opinion to undertake a detailed statement of what each witness said and each exhibit disclosed. However, we will endeavor to set forth enough of the facts and the testimony, pro and con, to demonstrate whether undue influence was a jury issue. Many of the important facts are not controverted in the testimony.

In 1944 Dorsey was residing upon the Franklin County 808 acres of land as his home. He had so resided for many years. In fact, he inherited this land from his father. He was a member of the Negro race. He could neither read nor write. He was around 85 years of age. Mr. Halford had formerly lived in, or near, Meadville, in said Franklin County and he knew Dorsey. About August 1944 Dorsey left his home and went to Fayette, in Jefferson County, Mississippi. Mr. Halford lived at Fayette. He is a white man, was, and had been for many years, a prominent merchant of Fayette. He was a shrewd business man and had accumulated much property according to the undisputed proof. The testimony as to whether Dorsey intended that his move should be temporary or permanent is in sharp conflict. Some witnesses say he took with him only a suitcase and sparse clothing and that he frequently expressed the intention of returning to his home in Franklin County. On the other hand, some say they had heard Dorsey give utterance to statements indicating he intended to remain at Fayette. Other testimony of this question will be developed later when we discuss the legality of the removal of the administration and will contest proceedings to Franklin County. In any event, about August 1944 we find Dorsey living in a house in Mr. Halford's backyard. The testimony, on the one side, is to the effect that this was a shabby cabin, having therein only a bed and sparse furniture, with no water or electric lights.

On the other hand, witnesses testified that it was a nice, comfortable, small building, with electric lights and water. In other words, the testimony on behalf of Halford tends to show that he was a good Samaritan; that it was his object and purpose to care for this old negro during his last days on this earth. On behalf of contestant the testimony tends to show that Mr. Halford moved Dorsey to his home, placed him in his backyard where he could watch and control him and his actions, all with the intent and purpose of acquiring Dorsey's property.

Shortly after Dorsey moved to Fayette we find him executing various instruments with reference to his real property in Franklin County.

On August 7, 1944, Dorsey executed to W. J. Sullivan an instrument giving Sullivan the option to purchase the timber on the 808 acres of land for the sum of $16,000. This covered all merchantable timber on the land, was to be accepted by September 7, 1944, and was without time limit for removal of the timber.

It appears that immediately after executing this option Dorsey became very much dissatisfied. He left the cottage in which he was living and hid himself out. Mr. Sullivan could not find him. On August 28, 1944, Sullivan filed a suit in Franklin County to require Dorsey to comply with this option. Mr. Halford exercised himself about this matter but the record is not very clear as to just what he did. In any event, on October 25, 1944, Dorsey executed to Sullivan another option on this timber. This option defined the sizes of the timber covered by the option and limited the time of removal to three years.

On October 26, 1944, Dorsey executed to Sullivan a deed to the timber according to the terms of the second option. Naturally the chancery suit was dropped.

Between August 7, the date of the first option, and October 26, the date of the timber deed, important transactions had taken place between Mr. Halford and Dorsey.

On September 8, 1944, Dorsey executed to Mr. Halford a deed of trust on the 808 acres of land to secure an alleged indebtedness owing by Dorsey to Halford in the sum of $3,000.00. The debt was to be due September 8, 1945, and no timber was to be removed from the land without the written consent of Mr. Halford. So far as we can glean from the record there is no proof that any part of the amount secured by this trust deed was ever paid by Halford to Dorsey, nor is it shown that Dorsey was indebted to Halford in any amount.

On October 11, 1944, Dorsey executed a warranty deed to Halford, conveying to Halford the 808 acres of land, Dorsey reserving a life estate therein. The consideration for that deed, as expressed in the deed itself, was the cancellation of the three thousand dollar trust deed, and other valuable considerations. It is not shown, so far as we have detected, that the trust deed was ever cancelled or that any consideration whatever was paid for the execution of that deed. In fact, as we understand from the argument and brief of Halford, he is not making claim to the land under that deed.

On October 21, 1944, Dorsey executed his will. He signed this document, as well as all others executed by him above set out, by making his mark. It was signed in the office located in the store being operated by Halford in Fayette. It was witnessed by R. J. Allen, the Mayor of Fayette at the time, and by Mrs. Lillie Sanders and Miss Lee Lessing, who were employees of Halford working in his store. The witnesses testified that Allen read the will and that Dorsey said it disposed of his property as he desired to dispose of it. The witnesses also said no influence was exercised by Halford upon Dorsey at the time of the execution of the will. The will recited the testator had no wife, child or grandchild and that Mr. Halford, and his father, had been friendly to Dorsey's father during his life time, and that Halford had been kind and considerate of Dorsey ''and has given many evidences of his interest in me and my welfare.''

The will had been prepared by Mr. Halford's attorney at Halford's request and under his instructions. It devised and bequeathed to Halford all property of every kind Dorsey might own at the time of his death. Allen signed Dorsey's name to the instrument and Dorsey made his mark.

Reverting to the Dorsey timber deed, it appears that, while the check was payable to Dorsey, as we surmise from the testimony, it was actually delivered to Mr. Halford at his store and was by him deposited in a special account in his name at the Jefferson County Bank of Fayette, with instructions by Halford that none of it be paid out except upon his orders. When Dorsey departed this life he had to his credit in that Bank the sum of $600.00 and $13,714.59 was to the credit of Mr. Halford in the special account. However, Mr. Halford informed the bank that the money in the special account belonged to Dorsey. It also appears, in connection with the timber deal, that in May 1945 the timber resold for the sum of $28,000.00.

The testimony was conflicting upon a number of factors tending to establish or negative the influence of Halford over Dorsey.

As to Dorsey's cause for gratitude to Mr. Halford, the testimony in Halford's behalf tended to show that he cared for and looked after Dorsey; that he furnished Dorsey, without charge, a comfortable place in which to live; gave him meals from his own kitchen and properly clothed and generally looked after him. On the part of contestant Hines there was testimony to the effect that the house furnished Dorsey was not a fit place for human habitation; that he went about dressed in rags and did not receive sufficient food, and that there was no cause for gratitude on the part of Dorsey.

On the part of Halford, the testimony tended to show that Dorsey was at liberty to go where and when he desired. On behalf of contestant it was to the effect that

Dorsey seldom went any place without the presence of Halford; that Halford was always with him.

As to control of Halford over Dorsey the testimony of contestant showed that there was complete dependence by Dorsey upon Mr. Halford; that Dorsey was a very old, illiterate, ignorant Negro. A number of witnesses said Dorsey had no money and that they gave him small amounts from time to time; that Dorsey said that Mr. Halford had his money; that he had to do what Mr. Halford said, and that he wanted to go back home but that Mr. Halford was restraining and keeping him at Fayette. There was proof also that Dorsey was superstitious, and that Mr. Halford, at different times, had told Dorsey that if he went back to his old home he would be killed, and that Dorsey was afraid to go home. A number of witnesses testified to this fear on the part of Dorsey and that they had assured Dorsey he had no enemies and his fear was entirely groundless; nevertheless, it is also shown that, prompted by this fear, Dorsey several times slipped back to his old home and was found hiding in the woods to avoid injury at the hands of his imaginary enemies.

Hines, contestant, lays special stress upon the testimony of the witness Allen, Mayor of Fayette and close friend of Mr. Halford's. He said Mr. Halford informed him "he had some papers fixed up * * * Uncle Joe was sitting down on the porch and Mr. Halford said he had some papers filled out between him and Uncle Joe, and I didn't know it was a will until we got back to his office * * * and I said 'Giles, how in the hell do you get that' and the way he said it 'treat them right Partner, treat them right,' and then is when I asked him do you realize what you are doing"

This attesting witness also said: "Before I read the will to him he said he was making his will to, in his words, 'my friend Giles Halford.' I asked him just what was the cause, and he said for his life had been threatened and look like he was going to be killed for his prop-

erty and he wanted protection and he come to Jefferson County and Mr. Halford and his father had been his good friends all these days and he wanted a living out of it and for them to have what he had at his death.''

Some other evidence bearing upon undue influence will be set forth hereinafter on the change of venue question. Also, we might now detail more of the evidence on this question but think we have set forth sufficient thereof to pass upon the contention that there is no substantial evidence to support the finding of the jury.

While the chancellor instructed the jury that Dorsey had the mental capacity to execute a will, yet his mental and physical condition may be considered as bearing upon his susceptibility to undue influence. Isom v. Canedy, 128 Miss. 64, 88 So. 485. It is in evidence that he was ninety-one years of age when he died in 1950. That means he was around eighty-five years of age when he executed the instrument in question. He was ignorant and illiterate. According to proof of contestant he was under the direct, personal control of Mr. Halford, living in his backyard, and subject to the wishes of Mr. Halford.

Whether true or not, as a fact, the jury heard testimony to the effect that Mr. Halford had produced in this old man a state of fear of personal injury if he moved back to his old home, the effect of which was to keep Dorsey in his backyard and under his control.

Halford urges that the attesting witnesses testified that Dorsey executed the instrument of his own free will. That is true judged by words and acts of Dorsey at that particular time. However, what effect might have been produced upon Dorsey by the setting — the will already prepared under instruction of Mr. Halford, the presence of Mr. Allen, the Mayor of the town, and a friend of Mr. Halford, and of the two ladies who witnessed the will, and especially the presence of Mr. Halford — was a matter for the jury.

What happened at the time of execution is not controlling. The status of undue influence, by its very

nature, usually is the result of accumulating forces. Also, it often happens that it can be shown only by circumstantial evidence. Woodville v. Pizatti, 119 Miss. 442, 81 So. 127.

The execution by Dorsey of the various instruments above set forth, divesting himself of title to a valuable estate and investing title in Halford, rendering himself helpless, was a most important fact for consideration by the jury. He executed a trust deed to Mr. Halford to secure a debt of three thousand dollars when he was not indebted to Halford. He then executed a warranty deed to the 808 acres of land to satisfy a fictitious debt. Following that he executed the will, all within a space of a month and a half.

 We think the evidence was sufficient to justify the verdict of the jury.

 Halford was permitted to testify on the issue of removal of the administration and contest proceeding from Jefferson County to Franklin County, but the court refused to permit him to testify on the contest issues of mental capacity and undue influence. Counsel for Halford say that, while ordinarily Section 1690, Miss. Code 1942, would deny to Halford the right to be a witness on the merits in this case, yet Hines, although making oath to his bill, did not waive answer under oath, thereby making Halford a competent witness under Fant v. Fant, 173 Miss. 472, 162 So. 159. That section and that case deal with the weight of a sworn answer of claimant as evidence under Section 1294, said Code — not with the competency of one to take the stand and testify to establish his claim against the estate of a decedent under said Section 1690.

 Halford urges that it was reversible error to remove the administration and contest proceedings from Jefferson County to Franklin County. Section 495, Miss. Code 1942, provides: "Wills shall be proved in and letters testamentary thereon granted by the chancery court of the county in which the testator had a fixed place of

residence. If he had no fixed place of residence, and land be devised in the will, it shall be proved in and letters granted by the chancery court of the county where the land, or some part thereof, is situated. If the testator had no fixed place of residence, and personal property only be disposed of by the will, it may be proved in and letters granted by the chancery court of the county where the testator died, or of the county in which some part of the property may be.'' A fixed residence is not lost by temporary removal. Clark v. Quick, 36 N. E. 2d 563, 377 Ill. 474.

■■ A number of witnesses testified on the question of removal. The chancellor accepted the testimony of witnesses for Hines; therefore, we will test that action by briefly setting forth the testimony of Hines' witnesses.

C. H. Herring was exchancery clerk of Franklin County. All of the life of Dorsey he, Dorsey, except for the time he had been at Fayette, had lived upon the 808 acres of land as his home.

Harvey Vactor testified to the same effect and further said that some two weeks before Dorsey's death he saw Dorsey in Franklin County; that Dorsey said he was looking for his friend Congressman Dan McGehee to get his business matters straightened out; that he could not go home until that was done because he feared he would be killed; that he called his old home place his home and said he was coming back; that Dorsey said he had not moved to Fayette; that ''Mr. Giles (Halford) told him if he went back he would be killed''; that Dorsey died at the home of Bruce Hines, contestant, and was buried upon the old home place.

Cammie Dorsey, seventy years of age, testified that Dorsey had lived on the 808 acres all of his life; that when he went to Fayette he did not move any of his household effects, and Dorsey said he was coming back home.

Johny Dorsey was born on the Dorsey place. He said Dorsey called that his home; that he was coming back to it; that Dorsey was buried in the graveyard on that place. Witness said Dorsey carried only a suitcase to Fayette; that he left all of his household effects in the house on the old home place.

As stated, Halford offered proof, most of which contradicted but some of which supported the foregoing. The chancellor accepted that favorable to removal and we think there was ample testimony to support his finding.

Affirmed.

*Hall, Kyle, Arrington* and *Gillespie, JJ.,* concur.