Young *v.* Martin, et al.

No. 41603 January 9, 1961 125 So. 2d 734

862

*Gordon & Gordon,* Liberty; *Breed O. Mounger,* Tyler-town, for appellant.

*King & King*, Durant; *Clay B. Tucker*, Woodville, for appellees.

LEE, J.

Roy J. Martin died on December 29, 1958. Thereafter on February 11, 1959, Mrs. Hosea Young filed her petition to probate in solemn form the alleged last will and testament of this decedent. The will provided bequests of one dollar each to his three sons, Roy, Jr., William Richard, and Van Gene, and one dollar to his wife, Mrs. Mary Emma Martin. The remainder of his property was bequeathed to his sister, Mrs. Young, the petitioner. The three sons, on June 12, 1959, filed a caveat and objections to the probate. They charged that their father, at the time, was mentally incompetent to make a will; and that Mrs. Hosea Young, together with a brother, Gene Martin, and his son W. E. Martin, and a sister of the testator, Mrs. Vivian Douglas, and the husbands and wives of those parties, over a period beginning about July 28, 1954, when the testator suffered a severe injury resulting in the loss of both legs, until January 17, 1957, the date of the alleged will, and thereafter, used undue influence and coerced their father into making the will after they had destroyed his free agency by gross misrepresentations as to them and had alienated him from them and caused him to disinherit them. Mrs. Martin had obtained a divorce in January 1958 and was no longer an heir of the testator.

At the conclusion of the evidence the issue was submitted to a jury, who found against the will and in favor of the contestants. From the decree entered thereon, Mrs. Young appealed.

The appellant's requested peremptory instructions on both issues were refused. She complains of errors in the rulings on those requests, in the admission of certain evidence, in the giving of a certain instruction for the contestants, and that the trial court erred in overruling her motion for a new trial because the verdict of the jury was contrary to the great weight of the evidence.

There was little, if any, refutation of the contestants' evidence on the issue of undue influence. There was a

sharp dispute however in the evidence on the question of mental capacity. Inasmuch as the jury decided against the will, it is requisite that the evidence for the contestants should be viewed in its most favorable light. In substance it was as follows:

Mrs. Mary Emma Martin testified that she and Roy J. Martin were married on November 26, 1931. Three boys, the contestants, were born to them. While their economic state was difficult at times, they had a happy family. Unfortunately her husband suffered nervous breakdowns in 1934, 1938, 1941, and 1952, and each time he had to be taken to Whitfield for treatment. He was working for the Illinois Central Railroad on July 28, 1954, when he was struck by a train. One leg had to be amputated immediately. About a year later, it was necessary to remove the other. His first hospitalization lasted about 3 months. But, almost immediately after his return to his home in Durant, his condition became grave, and it was necessary for him to be hospitalized again. Mrs. Martin obtained furloughs for the two sons who were in the armed forces, and she and the boys ministered to and comforted their husband and father in every way that they could. She stayed with him in the hospital all of the time. Not having money to buy food, much of the time she ate the leavings on his plate. Roy's brothers and sisters, including Mrs. Hosea Young and other kin, visited him in the hospital. At first they were friendly, but later, when they came to see him, they would ask Mrs. Martin to leave the room. They conversed with him in whispers.

Roy's attitude toward his wife and his sons became cold and indifferent. On this point, there was corroboration by his foreman, two former pastors of the church to which he belonged, and a practical nurse, all of whom had seen Roy a number of times. One of the witnesses told of Roy's despondency and of his accusation that the boys merely wanted his money when William Richard

offered a Father's Day gift. This same witness was also of the opinion that Roy had "a very disturbing element" in his mind. Another witness, who doubted Roy's competency, testified that Roy said that Mrs. Young and other members of his family had told him that his sons had turned against him, and he believed that the report of Roy Jr.'s committal to Whitfield was a mere ruse on the part of his wife and sons to get him into that institution. A nephew of the decedent did not think that his uncle was insane, but was of the opinion that he was unstable, and, at times, was easily influenced.

The testimony of Mrs. Martin pointed out certain specific incidents as follows: (1) Mrs. Vivian Douglas tried to have Roy's insurance changed to her. (2) W. E. Martin, just before the second operation, tried to get a will signed by Roy. (3) Mrs. Young, on one occasion, accused Mrs. Martin of neglecting both Roy Jr. and his father, and said "we are going to take him and get him out of that trouble". (4) W. E. Martin ignored a "No Visitor" sign and bolted into the hospital room, saying to Mrs. Martin, "we are going to give you a settlement and send you home", to which all of the family assented; and Mrs. Martin was forced to call the police to quell their disorder. (5) The family accused Mrs. Martin of poisoning her own father and told Roy that she would do the same thing to him. (6) Against Mrs. Martin's wishes, the hospital authorities in New Orleans released Roy to a claim agent of the railroad company, who took him to Lexington, Miss., where he filed a suit against her for a divorce. (7) When Mrs. Martin returned to New Orleans, a notice had been posted on the bulletin board barring her and her sons from entry into the hospital. (8) Roy Jr. was so affected by the charges against his mother and the coldness of his father that he lost his job and had to be placed in Whitfield for a period of seven months; and the boy's father,

although earnestly solicited to do so, did not visit him at all.

Because of her husband's coldness toward her, and being fearful that he would sacrifice or lose his rights against the railroad company, Mrs. Martin, after counseling with her pastor, in June 1956, filed a petition in the Chancery Court of Holmes County for the appointment of a guardian for him. The boys, she said, had nothing whatever to do with that matter. However, no order thereof was ever made.

The decedent, on July 9, 1956, filed suit against his wife in the same chancery court to obtain a divorce. The bill charged her with habitual cruel and inhuman treatment, culminating in her effort to place a guardian over him. That suit was never tried.

- The evidence for the appellant was to the effect that the decedent, on January 17, 1957, was driven to the office of Hon. Mayes McGehee, an attorney in Meadville, by Mr. Douglas, the husband of Vivian, Roy's sister. McGehee testified that the decedent's object was to discuss his claim against the railroad company and to make a will. When Roy expressed the desire to leave his wife and sons only one dollar each, the lawyer explained that his wife could renounce the will and get one-fourth of the property. Notwithstanding this advice, Roy was determined to fix the will that way because his sons, as he said, never came to see him in the hospital, and they participated with their mother in trying to have him placed under a guardian. Besides his wife disturbed him about his lawsuit, and attempted to hire a lawyer to file a suit. In the opinion of this witness, Roy had his full mental capacity; he was perfectly capable of attending to his business; and he was competent to make the will. Consequently McGehee prepared the will in accordance with Roy's wishes and was one of the subscribing witnesses to it. He represented Roy thereafter in his claim against the railroad and in the

divorce action. In all of his relations with the decedent at the time of making the will, and since, he saw no change in Roy's mental condition. Mrs. Gene Horton, legal secretary of attorney McGehee, to whom the will was dictated and who was the other subscribing witness, was of the opinion that Roy was perfectly competent and sane. Jewel and Milton Williams, who had known the decedent most of his life, were of the opinion that there was nothing abnormal about him and that there was nothing to indicate that he was incompetent or unable to take care of his business.

After the execution of the will, Roy filed suit against the railroad company in Pike County. The company filed a plea in abatement, which raised the question of his mental capacity. Although the court, after the hearing on July 16, 1957, overruled this plea and held that he was not suffering from any mental illness, the company presumably deemed it necessary to obtain an adjudication on that question.

Roy's claim against the railroad company was subsequently settled for $53,000.00.

On December 18, 1957, Mrs. Martin filed suit against her husband for a divorce. The date of their final separation was given as July 11, 1956, and the charge was desertion. A copy of the property settlement between the parties showed that she deeded to him her interest in certain land in Pike County; that he deeded to her his interest in certain property in Durant, Mississippi; and that he paid to her $5,000.00. She was awarded a decree of divorce on January 14, 1958.

Among the effects found in the possession of Roy after his death was an annuity policy in the sum of $10,000.00, payable to his sons. This policy was delivered to the beneficiaries and was worth at the time approximately $7,000.00.

■■ ■ To be undue, the influence must be dominant. Isom v. Canedy, 128 Miss. 64, 88 So. 485. ■■■ From

the nature of the case, evidence of undue influence has to be gathered from circumstances, as it is not usually exercised openly in the presence of others. Powell v. Plant, (Miss.) 23 So. 399; Isom v. Canedy, supra; Curry v. Lucas, 181 Miss. 720, 180 So. 397; Halford v. Hines, 223 Miss. 786, 79 So. 2d 264; Croft v. Alder, 237 Miss. 713, 115 So. 2d 683. In Powell v. Plant, supra, it was said: "The evidence of undue influence will, from the very nature of the case, be mainly circumstantial. It is not usually exercised openly in the presence of others. * * * While no absolute rule or test can be formulated, yet there seems to be unanimity among the authorities in holding that in order for the influence to be undue, in the sense that avoids the contract, it must be such as in some measure destroys the free agency of the party sought to be bound."

The evidence for the contestants, on undue influence, was in fact not refuted. Obviously the jury believed it, together with the reasonable inferences therefrom. When it is kept in mind that undue influence must necessarily be proved by circumstantial evidence, it is apparent that the jury, from the circumstances, evidently reasoned thusly:

Before the injury, the Martin family was a normal and happy one. Since Roy had undergone four nervous upsets, necessitating treatment at Whitfield, he was somewhat mentally unstable. The complete loss of one leg and the anticipated loss of the other must have had a terrible emotional impact on him, and produced a feeling of despondency and helplessness. In such a situation, he was an easy prey for anyone with ulterior purposes. A continuing assault was made upon this bedeviled man by the appellant and other relatives. They accused his wife of poisoning her father, both directly and indirectly suggesting that she would poison him. One of them said he would not even take a drink of water if she offered it. These relatives had him believ-

ing that his sons not only never visited him in the hospital, when actually furloughs were obtained for two of them for that express purpose, but also that they were plotting to have him placed under a guardianship so that they could get his money. Roy even charged that his sons were merely thinking about what they could get out of him. Why the breakdown of the happy family relationship, and the alienation of his affections for his wife and sons? Roy had a claim against the railroad company out of which he ultimately realized $53,000.00. Before the second operation, one of the relatives made an effort to have Roy's insurance changed to her. Another tried to get a will signed. The proponent told Mrs. Martin that they were going to take him and get him out of that trouble. In July 1956, notice was placed on the bulletin board barring Mrs. Martin and the sons from the hospital in New Orleans. The decedent then took up his abode with the appellant and other relatives. When the will was executed on January 17 following, a brother-in-law drove him to the law office. That will did the unnatural thing of disinheriting, for all practical purposes, the wife and the sons, one of whom was afflicted, in spite of the fact that the sons had visited the testator in the hospital, and had nothing to do with the guardianship proceeding. In other words, the proponent and other kin wielded such a strong influence over Roy that they alienated, without just cause, his natural affection for his wife and sons, and, in great measure, destroyed his free agency to dispose of his property with the deliberate design to take and receive his property themselves.

 ██ The same rule for testing mental capacity applies alike to wills and deeds. Temporary or intermittent insanity or mental incapacity does not raise a presumption that such disability continued to the date of execution. ██ It is sufficient if the testator understands and appreciates the nature of his act, the natural

objects or persons of his bounty and their relation to him, and is capable of determining how he desires to devise and bequeath his property. Lambert v. Powell, 199 Miss. 397, 24 So. 2d 773, and authorities there cited. See also Cowart v. Cowart, 211 Miss. 459, 51 So. 2d 775; Hunt v. Lewis, 219 Miss. 812, 70 So. 2d 13; Pipes v. Webb, 236 Miss. 612, 111 So. 2d 641.

The evidence for the proponent was to the effect that the decedent, at the time of the execution of the will, was competent and had the mental capacity to make the will. But, obviously, if his mind had already been distorted and his free agency, in some measure, had been destroyed by reason of the urgent, impelling and undue influence of the proponent and others, the scrivener of, and witnesses to, the will might not have been able to detect that such influence had already been exercised. Especially would this be true if the course of conduct of the testator had been persistently dinned into his ears. The jury was entitled to measure the capacity of the decedent in the light of all of the evidence.

It is true, as this Court has decided, that a person "of sound mind may execute a will or a deed from any sort of motive satisfactory to him, whether that motive be love, affection, gratitude, partiality, prejudice, or even a whim or caprice". Burnett v. Smith, 93 Miss. 566, 47 So. 117; Herrington v. Herrington, 232 Miss. 244, 98 So. 2d 646. It can hardly be said that the will in this case, ignoring in fact the wife and children, was motivated by love, affection, gratitude or partiality. It is sufficient to say that it was for the jury to determine whether in fact it stemmed from prejudice, whim or caprice, or whether it was spawned by, and was the handiwork of, the proponent and others, who dominated the decedent's thinking.

 █ The opinions of the witnesses, in practically all instances, were formed as a result of their detailed

observations. The issues were fairly presented in the instructions. The requested peremptory instructions were correctly refused. The cause was properly submitted to the jury; and the verdict was not against the great weight of the evidence.

It therefore follows that this cause must be, and it is, affirmed.

Affirmed.

*Hall, P. J.,* and *Arrington, Gillespie,* and *McElroy, JJ.,* concur.

## APPELLEES' MOTION TO CORRECT JUDGMENT

LEE, J.

■■ ■ The chancery court, in its decree, taxed the costs in the trial court against the estate of the decedent, Roy J. Martin, Sr. Presumably this action was taken under the provisions of Section 1583, Code of 1942, Recompiled, which is as follows: "The chancery court shall have power to decree that either party shall pay the costs of any suit in equity, or that the same may be divided as may appear equitable."

The appellees, in their cross-appeal, contended that the court erred in so taxing the costs, and that the same should have been assessed against the proponent. The Court was of the opinion that such contention was without substantial merit because of the quoted section of the Code. However, the opinion merely affirmed the cause without expressly saying that the affirmance applied to both the direct and the cross appeals. The Court does now say that the cause is also affirmed on the cross-appeal.

■■ ■ In the decree here, the costs were taxed, as they should be, against the appellant and her sureties.

Consequently the suggestion by the appellees or cross-appellants to correct the decree of this Court so as to

require the appellant to pay the costs in the trial court is overruled.

Motion to correct decree overruled.

*Hall, P.J.,* and *Arrington, Gillespie* and *McElroy, JJ.,* concur.