741 So.2d 366 (1999)
Michael W. HOLMES, Individually and as Executor of the Estate of Louie W. Holmes, Appellant,
v.
Elizabeth Ann Holmes O'BRYANT, Appellee.
No. 98-CA-00560-COA.
Court of Appeals of Mississippi.
May 18, 1999.
*368 Irving Conrad Mord, II, Tylertown, Attorney for Appellant.
Joseph M. Stinson, Tylertown, Attorney for Appellee.
BEFORE BRIDGES, C.J., COLEMAN, AND IRVING, JJ.
BRIDGES, C.J., for the Court:
¶ 1. Michael W. Holmes, individually and as executor of the estate of Louie W. Holmes, is attacking the September 10, 1993 warranty deed in which his father, Louie W. Holmes, conveyed real property and mineral interests in Walthall County to Elizabeth Ann Holmes O'Bryant charging that the conveyance executed by Louie to Elizabeth was procured through undue influence at a time when Louie, because of advanced age, weakness of mind and sickness, lacked mental capacity to understand and appreciate the nature and effect of said conveyance. Michael and Elizabeth are brother and sister and two of four children born to Louie W. Holmes. The other two children are not parties to this action.
¶ 2. Following presentation of Michael's case-in-chief, Elizabeth moved to exclude the evidence and dismiss the complaint and amended complaint pursuant to M.R.C.P. 41(b) arguing Michael had failed to meet his burden of proof. The chancellor, after hearing arguments on the motion and considering Mississippi law, entered a final judgment dismissing the action on its merits. Michael appeals asserting the trial court abused its discretion in sustaining Elizabeth's motion to exclude the evidence and her Rule 41(b) motion to dismiss the action. We affirm.

FACTS
¶ 3. On September 10, 1993, Louie Wesley Holmes, 67 years old, was the father of four children: Michael, Elizabeth, Sherry and Johanna. When Louie and his former wife, Dorothy, divorced, Michael and Elizabeth chose to live with Louie, and Sherry and Johanna went to live with Dorothy. Sherry and Johanna are not parties to this action.
¶ 4. The record shows Louie was an intelligent, industrious man. He had a high school education and served in two branches of the military. He worked at Standard Oil before becoming a self-employed electrician. He was part owner of a restaurant with his former wife. In his later years, Louie worked for the Herd Improvement Association weighing milk. *369 Louie owned three mobile homes and a house on his property that he rented to tenants. Rental payments from tenants were collected by Louie personally. He maintained the property himself.
¶ 5. With eyeglasses, Louie's eyesight was good, and he had no problem with his hearing. He was diagnosed with Parkinson's disease in 1992.
¶ 6. Louie lived alone. He continued driving his truck until shortly before he was hospitalized in September 1993. In late 1992 or early 1993, Louie drove alone to Beaumont, Texas to visit Michael.
¶ 7. John Holmes, Louie's older brother by nine years, testified that he arranged for Elizabeth and him to meet with John's attorney, Joe Stinson, on August 3, 1993, to discuss having Louie's business affairs turned over to Elizabeth because Louie "just got where he couldn't look after himself." No action was taken as a result of the meeting, however.
¶ 8. About two weeks later, Louie asked Elizabeth to arrange an appointment with Stinson to discuss preparing a deed giving his property in Walthall County to Michael and her. While enroute to Stinson's office, Louie informed Elizabeth that he had changed his mind and wanted to give the land solely to Elizabeth because Louie had done other things for Mike. The record shows that Louie had helped with Michael's medical school costs.
¶ 9. When Stinson had the deed prepared, Elizabeth drove Louie to Stinson's office. Stinson went over the deed with Louie and Elizabeth explaining everything. Elizabeth then drove Louie to the Walthall County courthouse where Louie executed the deed in the presence of Nancy Kennedy, a deputy chancery clerk.
¶ 10. The events surrounding Louie's signing the deed were related by Elizabeth: Louie sat down to wait, while Elizabeth approached the counter to tell the deputy clerk that Louie needed to get a deed notarized. Nancy inquired whether Louie knew what the deed was and Elizabeth answered in the affirmative. Nancy then asked if Louie would like for her to bring the deed to where he was sitting. Without answering, Louie got up and walked to the counter. Nancy asked Louie if he knew what he was signing and he said yes. Nancy did not read the deed to Louie. Nancy acknowledged Louie's signature. The warranty deed, deed of conveyance and mineral deed was recorded the same day. Elizabeth paid the recording fee.
¶ 11. Louie was admitted into the Veterans Administration Hospital on September 17, 1993. Louie had been running a fever for about a week and Elizabeth was unable to get it down. Louie remained in the hospital until October 1993. Upon his discharge, he was transferred to a nursing home in Natchez where he remained for about four months. He was readmitted to the VA Hospital and died on April 28, 1994, approximately six months after the deed was signed.
¶ 12. After Michael finished presenting his case, Elizabeth moved for a M.R.C.P. 41(b) dismissal asserting Michael failed to meet his burden of proof to justify the court in granting any of the relief prayed for in the complaint or amended complaint.
¶ 13. After considering the evidence thoroughly and maturely, the chancellor found, in pertinent part, that:
1. The inter vivos warranty deed, deed of conveyance and mineral deed executed by Louie W. Holmes on September 10, 1993, and acknowledged by the deputy chancery clerk in which Louie conveyed his property in Walthall County to Elizabeth Ann Holmes O'Bryant was properly recorded and was valid on its face.
2. Michael failed to show by clear and convincing evidence that a confidential or fiduciary relationship existed between Louie and Elizabeth.
3. Michael failed to rebut the presumption that Louie had the requisite mental *370 capacity to execute the deed on September 10, 1993.
¶ 14. Based on these findings of fact, the chancellor rendered his opinion that Michael failed to prove by clear and convincing evidence that the deed should be set aside and canceled on the grounds of lack of mental capacity and undue influence. A final judgment was entered on March 26, 1998, dismissing with prejudice the complaint and amended compliant to cancel deed. Michael appealed.

ARGUMENT AND DISCUSSION OF LAW

WAS THE CHANCELLOR'S DECISION TO SUSTAIN THE M.R.C.P. 41(b) MOTION SUPPORTED BY SUBSTANTIAL CREDIBLE EVIDENCE AND NOT THE RESULT OF MANIFEST ERROR?
¶ 15. This Court's review of the chancellor's decision to grant Elizabeth's motion to dismiss is limited to ascertaining whether the record reveals substantial evidence to support the chancellor's findings. We must affirm the chancellor's findings when supported by substantial credible evidence and when not manifestly erroneous. Stewart v. Merchants Nat'l Bank, 700 So.2d 255, 258-59 (Miss.1997).
¶ 16. Rule 41(b) of the Mississippi Rules of Civil Procedure provides, in pertinent part:
After the plaintiff, in an action tried by the court without a jury, has completed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief.
¶ 17. In granting a motion to dismiss made under M.R.C.P. 41(b), a trial court should consider "the evidence fairly, as distinguished from in the light most favorable to the plaintiff," and the court should dismiss the case if it would find for the defendant. Stewart, 700 So.2d at 259 (quoting Century 21 Deep South Properties, Ltd. v. Corson, 612 So.2d 359, 369 (Miss.1992)). "The court must deny a motion to dismiss only if the judge would be obliged to find for the plaintiff if the plaintiff's evidence were all the evidence offered in the case." Id.

(a) Validity of Deed.
¶ 18. The chancellor found the warranty deed, deed of conveyance and mineral deed was facially valid. Michael asserts the deed is invalid in that no monetary consideration was paid or promised by Elizabeth for the conveyance. The parties stipulated that Louie signed the deed in the office of the Chancery Clerk of Walthall County in Tylertown in the presence of Nancy Y. Kennedy, Elizabeth Ann Holmes O'Bryant, and Ida Forbes, and that, according to the Walthall County Tax Rolls, the value of the real property described in the deed was $111,538 for 79.4 acres.
¶ 19. Elizabeth testified that Louie said he had done other things for Michael and that Louie wanted to do something for Elizabeth. Under Mississippi law, love and affection are considered consideration. It was reasonable for Louie to give his property to his daughter as a gift. As the chancellor noted, "[i]nter vivos deeds of gift are a perfectly respectable mode of conveyance." Mullins v. Ratcliff, 515 So.2d 1183, 1190 (Miss.1987). "A man of sound mind may execute a will or a deed from any sort of motive satisfactory to him, whether that motive be love, affection, gratitude, partiality, prejudice, or even a whim or caprice." Herrington v. Herrington, 232 Miss. 244, 250-251, 98 So.2d 646, 649 (1957) (quoting Burnett v. Smith, 93 Miss. 566, 47 So. 117, 118 (1908)).
¶ 20. The chancellor's finding that the inter vivos warranty deed, deed of conveyance and mineral deed was facially valid is supported by substantial credible *371 evidence and is not the result of manifest error. Before the court will scrutinize a facially valid inter vivos deed, a confidential relationship must be shown. Mullins, 515 So.2d at 1192.

(b) Confidential Relationship
¶ 21. Michael contends Elizabeth exerted undue influence to persuade Louie to convey the real property to her. The presumption of undue influence arises where a fiduciary or confidential relationship exists. Vega v. Estate of Mullen, 583 So.2d 1259, 1263 (Miss.1991). The burden of establishing the existence of a confidential or fiduciary relationship is upon the party asserting it. Id. Thus, Michael had the burden of proving by clear and convincing evidence that a confidential relationship existed between Elizabeth and Louie before the lower court had the authority to scrutinize the facially valid inter vivos deed.
The first question, when there is the possibility of undue influence, appears to be whether there existed between the grantor and grantee a confidential or fiduciary relationship. Such a relationship is defined as follows:
A confidential relationship such as would impose the duties of a fiduciary does not have to be a legal one, but may be moral, domestic or personal. The relationship arises when a dominant, overmastering influence controls over a dependent person or trust justifiably reposed. Such a relationship must be shown before we will scrutinize one's right to give away his property, for an inter vivos gift is a perfectly lawful means of transferring real property in this state.
The burden of establishing the existence of a fiduciary relationship is upon the party asserting it. Because of the severity of the burdens and penalties of the confidential relationship, the party claiming the benefits of the existence of such a relationship must establish clearly his entitlement.
Smith v. Smith, 574 So.2d 644, 650-51 (Miss.1990) (quoting Mullins, 515 So.2d at 1191-1192).
¶ 22. "Whenever there is a relation between two people in which one person is in a position to exercise a dominant influence upon the former, arising either from weakness of mind or body, or through trust, the law does not hesitate to characterize such a relationship as fiduciary in character." Mullins, 515 So.2d at 1191 (quoting Hendricks v. James, 421 So.2d 1031, 1041 (Miss.1982)).
¶ 23. Reviewing the evidence fairly, we find Louie depended on his brother, John Holmes, not Elizabeth, when he needed advice and assistance. John testified Louie was nine years younger than John and "was more like my own boy than he was brother." If Louie had business to tend to and he discussed it with anybody, he would discuss it with John. John was on Louie's checking account at Walthall Citizens Bank.
¶ 24. In 1993, John paid some of Louie's bills from his own funds. John would send the receipt to Michael and Michael would reimburse John. According to John, several times Louie asked John to call about his Social Security check when Louie did not remember receiving it. Although Louie entrusted some of his business affairs to John, Louie collected the rental payments from his tenants. After Louie went to the hospital, Elizabeth collected the rents for her father.
¶ 25. John visited Louie daily, paid his bills and carried meals to Louie. John testified that in the summer of 1993, Elizabeth would check on Louie as much as she could considering her work schedule and family responsibilities. She would carry Louie something to eat or take Louie to the doctor, when John was unable to do so. Louie would drive his truck to Elizabeth's house to visit and would spend the night occasionally on weekends.
¶ 26. When John suggested to Louie in August 1993 that Elizabeth step in and *372 help take care of Louie's business because John's wife required more care, "[Louie] said no way, he wanted it just like he had it." Thereafter, John arranged for Elizabeth to accompany him to his attorney's office to discuss what could be done for Louie because, according to John, Louie was no longer able to take care of himself. John and Elizabeth did not pursue any plan of action after the meeting, however.
¶ 27. About two weeks later, Louie asked Elizabeth to make an appointment with Joe Stinson for the preparation of the deed. When the deed was ready, Louie asked Elizabeth to arrange another appointment to review and obtain the completed deed. Elizabeth drove Louie to the attorney's office on both occasions and then to the courthouse to have the deed executed and recorded. Elizabeth paid for the deed and the recording fee. Elizabeth did most of the talking at the courthouse.
¶ 28. The chancellor found that the foregoing facts caused him "some concern about who was in control." However, the evidence was not clear and convincing that Elizabeth and Louie had a confidential relationship and that Elizabeth exerted undue influence over Louie to have the warranty deed, deed of conveyance and mineral deed executed in her favor. We find the chancellor's finding that Michael failed to show by clear and convincing evidence that a confidential or fiduciary relationship existed between Louie and Elizabeth is supported by substantial credible evidence and is not the result of manifest error.

(c) Mental Incapacity.
¶ 29. Michael asserts Louie did not have the mental capacity to execute the deed on September 10, 1993 due to his advanced age and sickness. When, as is the case here, the grantor signed and acknowledged the deed before a public official, the mental capacity of the grantor at the time he signed the deed is presumed. Lambert v. Powell, 199 Miss. 397, 400, 24 So.2d 773, 773 (1946).
Generally, the burden of proving lack of mental capacity rests upon the party asserting such lack. This is because of the presumption that a deed when properly executed was executed by a person with the requisite mental capacity to execute such deed. The smooth functioning of day-to-day business routine requires this degree of certainty.
Richardson v. Langley, 426 So.2d 780, 785 (Miss.1983).
¶ 30. To overcome the presumption that the deed was executed by a person with the requisite mental capacity, the party seeking to have the deed set aside must establish through clear and convincing evidence that the grantor lacked mental capacity at the time of execution. Id. at 783, 786.
We have traditionally made a distinction between "weakness of intellect" and a total lack of capacity to execute a deed. Such a "weakness of intellect" when coupled with another factor, such as grossly inadequate consideration, or the existence of a confidential relationship may be sufficient to warrant the granting of equitable relief. Absent such a confidential relation, or grossly inadequate consideration, a "weakness of intellect" in and of itself, which does not rise to the standard of a total lack of capacity to execute a deed is an insufficient basis upon which to set aside a deed. This rule allow[s] an equity court to set aside a deed upon a finding of a weakness of intellect, plus another factor such as [the existence of a confidential relationship].
Id. The grantor's mental capacity must be judged within the context of his actions at the time he executed the deed. Id. at 784. Michael was required to prove that Louie executed the deed at a time he was in a state of confusion caused by illness or advanced age sufficient to warrant the court to set aside the deed. "To constitute sufficient grounds for setting aside a deed, weakness of intellect must be accompanied by some other factor such as inadequate *373 consideration or existence of a confidential relationship." Vega, 583 So.2d at 1263.
¶ 31. In support of his argument that undue influence will be inferred in circumstances where there is no confidential relationship and sickness and infirmities cause the grantor great mental weakness, Michael relies on Puryear v. Austin, 205 Miss. 590, 39 So.2d 257 (1949) in which the Mississippi Supreme Court adopted the United States Supreme Court opinion in Allore v. Jewel, 94 U.S. 506, 24 L.Ed. 260 (1876). In Allore, the Supreme Court held that great mental weakness must be accompanied by gross inadequacy of consideration before undue influence will be inferred absent a confidential relationship:
It is not necessary, in order to secure the aid of equity, to prove that the deceased was at the time insane, or in such a state of mental imbecility as to render her entirely incapable of executing a valid deed. It is sufficient to show that, from her sickness and infirmities, she was at the time in a condition of great mental weakness, and that there was gross inadequacy of consideration for the conveyance. From these circumstances, imposition or undue influence will be inferred.
Id. at 510-11.
¶ 32. The chancellor found:
It's clear in the record that Mr. Holmes had been physically weakened for some time period. At least a week before [September 17] of 1993 he suffered from a fever that came and went. And it doesn't appear to be disputed in the record that there were some physical problems with Mr. Holmes during the relevant time period; and, in fact, Mr. Holmes was admitted to the VA Hospital on September 17, 1993 and, as I understand the evidence, never again lived outside of an institutional environment.
¶ 33. Here, no confidential relationship between Louie and Elizabeth was established by clear and convincing evidence. The inter vivos deed of gift from father to daughter required no monetary consideration, so there could be no "gross inadequacy of consideration." Although Louie had been physically declining for some time which necessitated John's assistance, Louie lived alone and managed his rental property until his hospitalization in September.
¶ 34. The evidence presented by Michael to prove his father's mental incapacity established that Louie's lack of memory and confused state were intermittent. "This Court recognizes that mental incapacity or insanity, `is not always permanent, and a person may have lucid moments or intervals when that person possesses necessary capacity to convey property.'" Whitworth v. Kines, 604 So.2d 225, 228-29 (Miss.1992) (quoting Young v. Martin, 239 Miss. 861, 125 So.2d 734, 738 (1961)).
¶ 35. Michael testified that in late 1992 or early 1993, Louie drove from Tylertown to Beaumont (a distance of approximately 280 miles one way) to see Michael without Michael knowing he was coming. Louie could not remember how to get to Michael's house once he arrived in Beaumont even though Louie had visited Michael previously. Louie asked a clerk at a convenience store to call Michael. When Michael asked what Louie was doing in Texas, Louie answered that he wanted to see Michael. Michael testified it had been a year since he had seen his father prior to Louie's trip to Beaumont.
¶ 36. When Michael accompanied Louie on his return trip to Tylertown, Louie knew where he was, who his children were and where his land was located. Michael did not see Louie again before September 10, 1993. Michael did talk to him on the telephone between the time he dropped Louie off at his house in early 1993 and September 10, but was not sure he talked to Louie in the month before September 17. Michael testified that on several occasions after he talked to his father, Louie would call again immediately. Louie was not as sharp mentally as he had been, but *374 Michael was never concerned to the point that he felt it was necessary to refer Louie to a doctor or for Louie to move into a nursing home or to live with someone. Michael testified when he visited his father in the nursing home in Natchez in late 1993, Louie recognized Michael and told Michael that he loved him.
¶ 37. Michael undertook to establish the mental incapacity of Louie to understand and appreciate the nature and import of a conveyance for the transfer of the title to land at the time the deed was executed by notations in the Veterans Administration Hospital records on September 17, 1993. In giving her father's medical history, the records indicated Elizabeth told the admitting physician that Louie's memory had been declining, that he had been wandering and that he had been removing his clothing. However, these events related by Elizabeth were general in nature and were not date specific to show Louie's mental capacity on September 10, 1993.
¶ 38. The medical records also indicated a diagnosis of "senile dementia of the Alzheimer's type" and that at the time of admittance a physical exam revealed Louie was "alert, and oriented to person. Disoriented to situation or time, flat affect." According to Michael, Parkinson's disease would give Louie a flat affect and shaking of the hands. The chancellor found "no evidence in the record to state what, if any, effect [senile dementia of the Alzheimer's type] would have upon [Louie's] ability to know the nature and extent of his property and to have the mental capacity to execute the deed in question." The mere notation that Louie was suffering from senile dementia of the Alzheimer's type was not conclusive that on September 10, 1993, Louie did not understand or appreciate the nature of his act, the natural objects or persons of his bounty and their relation to him, and was incapable of determining how he desired to devise and bequeath his property.
¶ 39. John testified he saw Louie on a daily basis as long as Louie was at home, unless John's wife was in the hospital. According to John, "[s]ometimes [Louie] would talk like he had more knowledge of what was going on than others. But at [other] times ... he wouldn't know what we had been talking about." John testified Louie would "sign anything you handed him," but John did not remember Louie signing anything in September of 1993 other than the deed. John visited Louie frequently at the Veterans Administration Hospital and at the Natchez nursing home. Louie always knew who John was. Louie "was as smart just like when he was at hisself (sic)." Louie always knew his children.
¶ 40. The chancellor concluded, although the evidence presented by Michael "cause[d] the court to have concern about [Louie's] status on the day the deed was executed," the evidence "miss[ed] by a wide margin" establishing that Louie lacked the requisite mental capacity at the time he executed the deed.
[T]he burden of proving lack of mental capacity rests squarely on the party seeking to have such deed set aside. Clear and convincing evidence is necessary to establish this lack of mental capacity. Unless the proof put on by the party seeking to set aside a deed establishes that the grantor was permanently insane up to and beyond the time of the execution of the deed, the test of the grantor's mental capacity is to be applied as of the time of the execution of the deed.
Id. at 652 (quoting Richardson v. Langley, 426 So.2d 780, 783 (Miss.1983)).
¶ 41. The evidence did not establish that Louie was suffering from great mental weakness, only intermittent periods of confusion and forgetfulness. While Louie was old and sick, he lived alone, drove his truck, and collected rent from tenants. His mental sharpness may have been diminished generally; however, no testimony was presented showing Louie suffered great mental weakness on September 10, *375 1993. Careful analysis of the testimony before the lower court reveals that the presumption that Louie had the requisite mental capacity to execute the facially valid inter vivos deed on September 10, 1993, was not rebutted by clear and convincing evidence.

CONCLUSION
¶ 42. Considering the evidence fairly, the chancellor properly granted the M.R.C.P. 41(b) motion to dismiss. The chancellor lacked authority to scrutinize the facially valid inter vivos deed in that no confidential relationship existed between Louie W. Holmes and Elizabeth Ann Holmes O'Bryant. Moreover, the chancellor's finding that Michael L. Holmes failed to prove by clear and convincing evidence that Louie W. Holmes lacked mental capacity to convey his real property to Elizabeth Ann Holmes O'Bryant on September 10, 1993, is supported by substantial credible evidence and is not the result of manifest error. We affirm the final judgment of the Walthall County Chancery Court dismissing the complaint to cancel deed and amended complaint to cancel deed.
¶ 43. THE JUDGMENT OF THE CHANCERY COURT OF WALTHALL COUNTY IS AFFIRMED. COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
McMILLIN, C.J., KING AND SOUTHWICK, P.JJ., COLEMAN, DIAZ, IRVING, LEE, PAYNE, AND THOMAS, JJ., CONCUR.