# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-SA-01245-COA

**BILLY G. PARROTT JR., SANTA'S TREE LAND & WHOLESALE FIREWORKS, LLC, AND KAREN PARROTT AND BILLY PARROTT JR., INDIVIDUALLY**          APPELLANTS

**v.**

**HERB FRIERSON, IN HIS OFFICIAL CAPACITY AS THE COMMISSIONER OF THE MISSISSIPPI DEPARTMENT OF REVENUE AND MISSISSIPPI DEPARTMENT OF REVENUE**          APPELLEES

| | |
|---|---|
| DATE OF JUDGMENT: | 10/18/2023 |
| TRIAL JUDGE: | HON. JAMES B. PERSONS |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CHANCERY COURT, SECOND JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANTS: | JAMES GARY McGEE JR. |
| ATTORNEYS FOR APPELLEES: | WILLIAM J. DUKES NICHOLAS A. LOMELI |
| NATURE OF THE CASE: | CIVIL - STATE BOARDS AND AGENCIES |
| DISPOSITION: | AFFIRMED - 05/20/2025 |
| MOTION FOR REHEARING FILED: | |

**BEFORE BARNES, C.J., WESTBROOKS AND WEDDLE, JJ.**

**BARNES, C.J., FOR THE COURT:**

¶1.    Billy and Karen Parrott and their business, Santa's Tree Land & Wholesale Fireworks LLC (collectively, the Taxpayers), were audited by the Mississippi Department of Revenue (MDOR). Part of their business was selling storage-locker contents that they described as "yard sales." The Parrotts did not believe their "yard sale" items were subject to sales tax. However, the MDOR disagreed, finding Billy Parrott Jr. and his business owed sales tax,

and, relatedly, the Parrots owed individual income tax. The Taxpayers disputed the assessments.

¶2. The MDOR's Board of Review affirmed the assessments, as did the Mississippi Board of Tax Appeals (Board of Appeals).[1] The Taxpayers filed a petition in the Chancery Court of Harrison County appealing the Board of Appeals' order. The chancery court dismissed the Taxpayers' petition with prejudice. Finding no error, we affirm.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

¶3. Billy and Karen Parrott are a retired married couple living in Harrison County, Mississippi. To supplement their income, Billy began operating a seasonal Christmas tree and fireworks business. He operated the Christmas tree stand from November through December and sold fireworks in December and July. Billy also purchased storage lockers at auctions. He then resold the contents of the lockers, along with some of the couple's own personal items, at the same time and place as the Christmas trees and fireworks. Billy described the selling of the locker contents and personal items as "yard sales." Initially, Billy ran the business as a sole proprietorship, but in July 2015, he formed a single-member limited-liability company named "Santa's Tree Land & Wholesale Fireworks, LLC" (Santa's Tree Land).

¶4. In July 2017, the MDOR audited the Taxpayers' sales and individual income taxes.

---

[1] Ultimately, the Board of Appeals found Billy owed $15,187 in sales tax, his business owed $25,000 in sales tax, and the Parrotts owed $2,891 in income tax. These figures include penalties and interest.

Sales tax records for Billy were reviewed from January 1, 2014, through December 31, 2015, and for Santa's Tree Land from August 1, 2015, through December 31, 2017.[2] Individual tax records for Billy and Karen were reviewed from January 1, 2014, through December 31, 2016.

¶5.    Approximately one year later, in July 2018, the MDOR auditor met with Billy to discuss the results.  The audit revealed unreported income and gross proceeds from the yard sales subject to sales tax.  These additional sales impacted the Parrotts' individual income tax audit, showing they received more income than reported on their Schedule C (Profit or Loss from Business) each year of the audit.[3]

¶6.    The Taxpayers appealed the assessments to the MDOR's Board of Review, arguing

---

[2] The MDOR audited Billy separately from Santa's Tree Land  for sales tax for the period when Billy had operated his business as a sole proprietorship before forming the limited-liability company in July 2015.

[3] A Schedule C tracks income (or loss) from a business operated by the taxpayer for purposes of filing a tax return.  IRS 2024 Instructions for Schedule C (April 9, 2025), https://www.irs.gov/pub/irs-pdf/i1040sc.pdf.  "An activity qualifies as a business if your primary purpose for engaging in the activity is for income or profit and you are involved in the activity with continuity and regularity."  *Id.*
    Billy's 2016 Schedule C for "storage lockers" was admitted for identification purposes only, but Billy was questioned about it in detail by the MDOR's counsel.  Billy testified that he reported  income and claimed business expense deductions on this schedule for a net loss of $1,199.  Billy testified this business had $68,951 in gross receipts or sales in 2016 and total expenses of $70,150, which included advertising, contract labor, equipment, and $30,266 to purchase the contents of storage lockers.
    Billy's 2017 Schedule C, admitted into evidence, showed the principal business of "yard sales" (and a business name of "storage lockers") reported a net loss of $7,561.  Gross receipts totaled $43,637 with total expenses of $51,198, which included the same types of expenses, including $9,430 for the purchase of storage-locker contents.  Billy filed a separate Schedule C for his Christmas tree and fireworks business.

that their yard-sale proceeds were not subject to sales tax, and the auditor did not account for all nontaxable or exempt sales. In January 2019, a hearing was held before the Board of Review, and in February 2019, the Board of Review affirmed the MDOR's tax assessments.

¶7. Aggrieved, the Taxpayers appealed the decisions to the Board of Appeals, and a hearing was held in October 2019. The Taxpayers argued that MDOR employees had advised them that their yard-sale proceeds were not subject to sales tax. They also claimed that only five percent of the yard-sale proceeds were from the storage lockers—the remainder was from their own personal items, which were not taxable. The MDOR acknowledged that yard-sale proceeds were generally not taxable.

¶8. In January 2020, the Board of Appeals affirmed the tax assessments, reflecting some slight adjustments due to penalties and interest. In March 2020, the Taxpayers filed a petition appealing the Board of Appeals' orders in the Chancery Court of Harrison County, where a bench trial was held in August 2023. After the Taxpayers rested, the MDOR moved the chancery court to dismiss the Taxpayers' claims involuntarily under Mississippi Rule of Civil Procedure 41(b).[4] The chancery court granted the motion and dismissed the Taxpayers' claims with prejudice, upholding the MDOR's assessments of tax, penalties, and

---

[4] Rule 41(b) provides, in pertinent part, that "[a]fter the plaintiff, in an action tried by the court without a jury, has completed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief." M.R.C.P. 41(b).

interest.

¶9.    From the bench, the chancellor found photographs of the "yard sales" posted on Billy's Facebook page and admitted them into evidence (as Exhibit 4), finding them particularly telling.  They showed numerous, sundry items of personal property for sale under a very large tent located in a commercial area at 15225 Lemoyne Boulevard in Biloxi, Mississippi.  The chancellor remarked that the photographs

> go[] beyond what I commonly understand a yard sale to be.  This is clearly a substantial operation.  It requires a lot of time and management skills, and I find that these were not casual, isolated or occasional sales.  They were a regularly conducted business, conducted generally at the time shown . . . [with the fireworks sales and Christmas trees] over a three-year period.

The chancellor also noted that "the description of the business on [Billy's] Schedule C" tax forms (Profit or Loss From Business) indicated "a fairly accurate description of . . . the way he conducted his business."  Moreover, the chancellor found Billy's testimony was not corroborated by "books and records of a regularly conducted business . . . to support why an item is on the tax return" or why an item is not considered income.  Regarding penalties and interest, the chancellor acknowledged that the Parrotts had made an inquiry to the MDOR about whether items sold at "garage/yard sales" were subject to sales tax.  However, the inquiry was made *after* the audits and assessments.  The MDOR advised the Parrotts that garage/yard sale items usually were not taxable.[5]  The chancellor noted that generally, when

_____

[5] The email exchange between the Parrotts and the MDOR on February 4, 2019, was entered into evidence.  The MDOR responded that it did "not have to collect sales tax for garage sales" unless they were "frequent," in which case the seller would need "to register

5

a taxpayer makes such an inquiry with the MDOR, it would not eliminate the tax liability or interest but may eliminate the penalties. However, the chancellor found that was not the case here, because Billy's use of the term "yard sale" did not accurately describe his business. The items were "not sold at a yard. [They were] sold on Lemoyne in front of a storage facility or at a church and other places."

¶10. On October 18, 2023, the chancery court granted the MDOR's motion to dismiss because the Taxpayers did not prove by a preponderance of the evidence that they were entitled to the relief requested in their petition. Specifically, the court found that the Taxpayers "were engaged in the business of selling tangible personal property" and were subject to sales tax. Further, the court found "the sales described by the [Taxpayers] as 'yard sales' were not isolated, casual, or occasional sales, but were made by [Taxpayers] in the course of business and not exempt from sales tax." The chancery court found the MDOR's sales tax audit assessments and individual income tax assessment were prima facie correct, and the Taxpayers did not present sufficient evidence to overcome the assessments' presumption of correctness. Finally, the chancery court concluded that the MDOR properly assessed penalties and interests.

¶11. The Taxpayers now appeal the judgment, raising four issues. They argue that the

for a sales tax number." The Taxpayers responded that they had garage/yard sales one to two times a year, disposing of personal items they had collected over sixty years. The MDOR responded that based on the information provided, it would "not need to collect sales tax at the garage sale."

chancery court erred in finding: (1) their yard sales were not isolated, casual, or occasional; (2) the MDOR's income tax assessment was prima facie correct; (3) the Parrotts did not present sufficient evidence to overcome the MDOR's presumption of correctness on income tax assessments; and (4) penalties and interest assessments were proper.

## STANDARDS OF REVIEW

¶12.    The procedure and standard for chancery court review of the MDOR's and Board of Appeals' decisions are as follows:

> [T]he chancery court shall give no deference to the decision of the Board of Tax Appeals, the Board of Review or the Department of Revenue, *but shall give deference to the department's interpretation and application of the statutes as reflected in duly enacted regulations and other officially adopted publications*. The chancery court shall try the case de novo and conduct a full evidentiary judicial hearing on all factual and legal issues raised by the taxpayer which address the substantive or procedural propriety of the actions of the Department of Revenue being appealed. . . .  Based on the evidence presented at trial, the chancery court shall determine whether the party bringing the appeal has proven by a preponderance of the evidence or a higher standard if required by the issues raised, that he is entitled to any or all of the relief he has requested.

Miss. Code Ann. § 27-77-7(5) (Rev. 2024) (emphasis added).[6]  Further, "[i]ssues related to tax appeals are questions of law, which are reviewed by [appellate courts] de novo." *Miss. Dep't of Rev. v. Comcast of GA/VA Inc.*, 300 So. 3d 532, 535 (¶12) (Miss. 2020).

¶13.    Additionally, the standard of review for a motion to dismiss under Rule 41(b) is

---

[6] The Mississippi Supreme Court has held the emphasized portion of the statute unconstitutional because it violated the separation of powers doctrine in our state constitution.  *HWCC-Tunica Inc. v. Miss. Dep't of Rev.*, 296 So. 3d 668, 677 (¶¶36-37) (Miss. 2020).

different from that of a motion for directed verdict. *Alexander v. Brown*, 793 So. 2d 601, 603 (¶6) (Miss. 2001) (citing *Stewart v. Merch. Nat'l Bank*, 700 So. 2d 255, 258 (Miss. 1997)). In reviewing a Rule 41(b) motion to dismiss, "the judge should consider 'the evidence fairly, as distinguished from in the light most favorable to the [p]laintiff,' and the judge should dismiss the case if [he or she] would find for the defendant." *Id.* (quoting *Stewart*, 700 So. 2d at 259). The appellate court reviews the grant or denial of a Rule 41(b) motion to dismiss under the substantial evidence/manifest error standard. *Stevens v. Est. of Smith*, 19 So. 3d 764, 768 (¶9) (Miss. Ct. App. 2009). "[T]his Court's review of the Rule 41(b) dismissal is 'limited to ascertaining whether the record reveals substantial evidence to support the chancellor's findings. We must affirm the chancellor's findings when supported by substantial credible evidence and when not manifestly erroneous.'" *Id.* (quoting *Holmes v. O'Bryant*, 741 So. 2d 366, 370 (¶15) (Miss. Ct. App. 1999)).

## ANALYSIS

### I.     The "yard sales" were not isolated, casual, or occasional sales.

¶14.    The Taxpayers argue that the chancellor erred in finding their "yard sales" were not isolated, casual, or occasional sales but were made in the course of business and subject to sales tax. They claim that the chancellor improperly based this determination on the review of Facebook photographs of the "yard sales." Thus, the Taxpayers contend the "yard sales" were not subject to sales tax.

¶15.    The Mississippi Code provides for sales tax on tangible personal property as follows:

"upon every person engaging or continuing within this state in the business of selling any tangible personal property whatsoever there is hereby levied, assessed and shall be collected a tax equal to seven percent (7%) of the gross proceeds of the retail sales of the business." Miss. Code Ann. § 27-65-17(1)(a) (Rev. 2024). For this statute, the definition of "'[b]usiness' shall mean and include all activities or acts engaged in (personal or corporate), for benefit or advantage, either direct or indirect, and not exempting subactivities in connection therewith." Miss. Code Ann. § 27-65-9(1) (Rev. 2024). The MDOR's regulations provide that certain "isolated or occasional sales" may not be subject to sales tax:

> Isolated or occasional sales, except sales of motor vehicles, made by persons not regularly engaged in business are not subject to sales tax. No sale, except a sale of a motor vehicle, is taxable under the Sales Tax Law if it is not made in the regular course of the business of a person selling tangible personal property.

35 Miss. Admin. Code Pt. IV, R. 3.02.

¶16. The chancery court found that the "yard sales" were not casual, isolated, or occasional sales but were a regularly conducted business and thus not exempt from sales tax. In support of this finding, the court pointed to photographs of the "yard sale," showing it was "clearly a substantial operation," constituting a great deal of various tangible personal property being sold under a large tent at a busy commercial intersection in Biloxi, in conjunction with the fireworks and Christmas tree sales. The chancellor remarked that the images went "beyond" what he commonly understood to be a yard sale. We agree.

¶17. While the Taxpayers complain that the chancellor improperly based much of his

9

decision on these photographs—which they claim have "little to no bearing" on whether the sales were casual, isolated, or occasional—we cannot agree. The chancellor also pointed to Billy's Schedule C filings for 2016 and 2017 for insight into how the "yard sale/storage-locker" business was conducted. Again, the sale of tangible personal property went beyond what would be considered a "yard sale" and was more like a regularly conducted business, with the same timing/frequency as the fireworks and Christmas tree sales. Gross receipts/sales for both storage locker and personal items in Billy's Schedule C for 2016 and 2017 totaled $68,951 and $43,637, respectively. The expense figures for 2016 and 2017 included $30,266 and $9,430, respectively, for the purchase of storage-locker contents.[7] Handwritten ledger sheets pertaining to the storage-locker and personal-item sales from 2014 through 2016 showed the totals for the sale of storage-locker items alone each year were $4,365.53, $6,376.32, and $5,117.31, respectively. Billy deducted the purchase price of the storage-locker contents as a business expense but did not collect and remit the sales tax on the proceeds of these sales because he deemed them not "made in the regular course of the business" but "isolated or occasional sales."[8]

¶18. The Taxpayers argue that the "yard sales" were isolated and infrequent because they were not year-round, citing Billy's testimony. Billy testified that on average, they held two

---

[7] Other expenses were advertisements, casual labor, credit-card fees, U-Hauls, and equipment such as jackhammers to cut through asphalt and concrete in order to erect a massive tent.

[8] The audit found that Billy did not report all of the income from these sales.

to three "yard sales" a year, which matched the Taxpayers' sales ledgers. He also testified the typical "yard sale" would last several days, but individuals would call him after the "yard sales" to purchase more expensive items for which they might not have previously had funds. Billy's handwritten notes reflect that, in 2014, transactions for "yard sales" were made on January 2, 3, and 6; June 18, 20, 23, 26, and 27; July 1, 2, and 7; November 24, 25, and 28; and December 1, 2, 3, 4, 8, 9, 10, 11, 12, 15, 16, 17, 19, 22, 23, 24, 26, 29, 30, and 31. Similarly, in 2015, transactions were posted for "yard sales" on January 1, 2, 3, and 4; June 21 and 28; July 2, 3, 4, 5, and 6; November 21, 22, 23, 24, 25, 27, 28, 29, and 30; and December 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 26, 27, 28, 29, and 30; and included three days of "dollar store" inventory at thirty-percent off, and a one-day sale each of hair and nail salon equipment. Only one entry expressly noted it was for the Taxpayers' own personal property, "[their] old King bedroom suite." Finally, in 2016, transactions for "yard sales" were listed on January 1, 2, 3, and 4; July 1, 2, and 3; November 25, 26, and 27; December 2, 3, 4, 9, 10, and 11. One transaction expressly noted it was for the Taxpayers' "old washer and dryer."

¶19. Substantial evidence shows, therefore, that the Taxpayers were engaged in the regularly conducted business of selling tangible personal property, as stated under the MDOR's regulations, which included the "yard-sale" items. The scope, location, expenses, and frequency all indicate the "yard sales" were a "substantial operation" and not casual, isolated, or infrequent. The scope of the "yard sales" was extensive, with substantial

11

expenses incurred. Further, the "yard sales" were not located in a garage or front yard, but in a large tent on the same premises where the Christmas trees and fireworks were sold. Even if we were to accept the Taxpayers' argument that the scope, location, and reported sales and expenses are all irrelevant to this issue, there is still evidence that the sales were not isolated or occasional. The occurrence of the "yard sales" was regular. Billy testified they were conducted in the ordinary course of the Taxpayers' other seasonal business of selling Christmas trees and fireworks in November, December, January, and July each year. Moreover, the sales were frequent, with the sales ledger showing for 2014 through 2016, thirty-four sales, forty-nine sales, and sixteen sales were made on as many days, respectively, with the majority of sales occurring in December. There is substantial evidence to support the chancellor's determination.

## II. The MDOR's income tax assessment was prima facie correct.

¶20. The Parrotts claim that the chancellor erred in determining that the MDOR's income tax assessment was prima facie correct.[9]

¶21. Taxpayers have a duty to keep and maintain adequate records for both sales tax and income tax and allow the MDOR to inspect them. Miss. Code Ann. §§ 27-65-43 (Rev. 2024) and 27-7-49(3) (Rev. 2017). "Refusal or delay" by the taxpayer to provide documentation to the MDOR will result in an income tax assessment, which shall be

---

[9] The chancellor found the MDOR's assessments of both sales and income tax were prima facie correct, and the Taxpayers do not dispute that the MDOR's sales tax assessments were prima facie correct.

considered prima facie correct:[10]

> Taxpayers shall keep and maintain an accurate and complete set of records and other information sufficient to allow the department to determine the correct amount of tax due. The records and other information shall be open and available for inspection by the department upon request at a reasonable time and location. *Refusal or delay by the taxpayer to provide documentation for examination upon the department's request shall result in an assessment being made from any information available, which shall be prima facie correct.*

Miss. Code Ann. § 27-7-49(3) (emphasis added).

¶22. Both the Parrotts and the MDOR cite *Rawan Hayaf LLP v. Frierson*, 323 So. 3d 555 (Miss. Ct. App. 2021). *Rawan Hayaf* dealt with the presumption of prima facie correctness. *Id.* at 564 (¶21). There, the MDOR's audit for both sales tax and income tax showed additional income due to increased business sales, which "flowed through" to the parties' individual tax returns. *Id.* at 565 (¶22). The taxpayers alleged that they had additional documents to show a correct calculation of income taxes owed, yet never provided such documents to the MDOR. *Id.* at 564 (¶21). This "failure to maintain accurate and complete records caused a delay in providing documentation to the auditors" to assess the individuals' tax liability. *Id.* This Court concluded that the failure to produce these documents "can only be viewed as a refusal or delay" under section 27-7-49(3), and the MDOR's individual income tax audits were entitled to a presumption of prima facie correctness. *Id.* at 564-65 (¶¶21-22).

---

[10] The same principle of prima facie correctness holds true for sales tax assessments. *See* Miss. Code Ann. § 27-65-42(4) (Rev. 2024).

¶23. The Parrotts argue that *Rawan Hayaf* is unlike the case at bar because here there was no evidence of "refusal or delay" in providing income tax documentation to the MDOR. They claim to have provided the MDOR auditor with their books and records, which included income tax returns, supporting documents for business expenses, handwritten sales records, bank statements, and check images. Further, the Parrotts contend that the auditor never stated that their records were inadequate. Therefore, the Parrotts conclude that the MDOR's income tax assessment could not be considered "prima facie correct."

¶24. In its order, the Board of Appeals found "the results of the related sales tax audit flowed through to the individual income" of the Parrotts. During the individual income tax audit, "the auditor compared the income per the sales tax audit with the income reported on the Taxpayers' Schedule Cs," as well as the expenses reported with purchase invoices and checks, with "a few reported expenses . . . disallowed."

¶25. The chancellor found that the individual income tax assessments at issue were prima facie correct. The chancellor explained that the Parrotts' evidence of whether an item was income was "essentially the oral testimony of Mr. Parrott" without further "back up" by "books and records of regularly conducted business." While the Parrotts did provide some records, they were not pertinent, complete, or accurate records for many transactions.

¶26. The record indicated instances where Billy failed to provide documentation during his audits. Billy testified that he loaned his credit card machines to charities and organizations out of state for fireworks sales, and the money received from the credit card

14

sales would be deposited directly in his bank account. The MDOR requested paperwork to support these deposits, but Billy failed to provide any written correspondence or contracts to prove the sales were anything other than income. Additionally, Billy testified that he made ATM withdrawals at a casino to have change for his business, which he claimed was a business expense. The MDOR, however, did not allow this withdrawal as an expense because it was made at a casino. In response, Billy failed to provide documentation to confirm the withdrawals were a business expense. The chancellor correctly found the Parrotts' failure to provide documentation "to support why an item is on the tax return" or whether it was income resulted in a presumption of prima facie correctness regarding their individual income tax assessment.

### III. The Taxpayers did not overcome the MDOR's presumption of correctness.

¶27. Relatedly, the Taxpayers disagree with the chancellor's finding that they failed to present sufficient evidence to overcome the presumption of correctness that attached to the MDOR's tax assessments.

¶28. In *Rawan Hayaf*, this Court discussed how the prima facie presumption of correctness, which arises when a taxpayer fails to keep adequate records of gross income and sales, is rebuttable. *Rawan Hayaf*, 323 So. 3d at 564 (¶21). In order for the MDOR's assessments to be prima facie correct, "the auditor must make them 'from any information available' according to section 27-65-37, not necessarily 'from the best information available.'" *Id.* at 558 (¶5) (quoting *United Roofing and Constr. of Miss. v. Miss. Dep't of*

15

*Rev.*, 319 So. 3d 1164, 1173 (¶25) (Miss. Ct. App. 2020)). "[S]ection 27-65-37 comports with Mississippi Rule of Evidence 301, dealing with presumptions in civil cases." *Id.* (internal quotation marks omitted). "[T]he party against whom a presumption is directed has the burden of producing evidence to rebut the presumption . . . [, but] the burden of persuasion . . . remains on the party who had it originally." *Id.* (quoting MRE 301).[11]

¶29. The Taxpayers claim that the chancery court failed "to meaningfully and specifically address" claims made in their petition; thus, they reason that the court could not determine whether they failed to overcome the presumption of correctness and that this failure constitutes manifest error. Specifically, the Taxpayers argue that the chancery court failed to address whether the Board of Appeals erred in determining that (1) the Taxpayers failed to provide any evidence to prove the MDOR improperly imposed the seven-percent sales tax rate on certain out-of-state sales, and (2) all non-business income was removed from the sales tax assessment.

¶30. We disagree with the Taxpayers' contention that the chancery court failed to address these issues. The chancery court disposed of the matters by ruling that the sales and individual income tax assessments were prima facie correct. Further, the Taxpayers failed to rebut the presumption of correctness, which shall be discussed next.

    A.  *Out-of-State Sales*

---

[11] Here, as in *Rawan Hayaf*, the Taxpayers only challenge the presumption of correctness regarding the individual income tax and not the sales tax assessments. However, since the sales and income tax assessments are intertwined, both will be discussed.

¶31.   Billy claims he offered proof to show the MDOR improperly taxed certain out-of-state sales for fireworks.  He testified that the funds from these out-of-state vendors were deposited directly into his bank account via credit card machines he loaned to the vendors.  He also testified that he provided the MDOR with sales invoices for these out-of-state sales, but the MDOR "wanted more."  Billy testified that he did not have "more" documentation; thus, the MDOR did not give him credit for the sales.  Further, even though the MDOR admitted in discovery that the Taxpayers "produced documentation to suggest sales were shipped [out of state], the proceeds of those sales could not be determined to have been deposited in any of the [Taxpayers'] bank accounts."

¶32.   The Taxpayers failed to meet their burden of proof in overcoming the presumption of correctness for this assessment.  As the chancery court noted, the only proof they provided was Billy's testimony, without any other "backup."  "A taxpayer's uncorroborated testimony . . . coupled with a failure to maintain adequate records . . . does not overcome the [MDOR's] prima facie correct assessment and, without other proof, does not suffice." *Jackson Land Food Mart Inc. v. Frierson*, 314 So. 3d 146, 152 (¶36) (Miss. Ct. App. 2021) (quoting *Marx v. Bounds*, 528 So. 2d 822, 825 (Miss. 1988)).

¶33.   Billy testified that he did not have a "substantial amount" of out-of-state sales, with most of the sales made by other organizations to which he loaned his credit card machines.  However, he could not identify which deposits were from out-of-state sales because they were deposited directly into his account from the credit card machines.  Further, Billy could

17

not provide any written paperwork such as correspondence or contracts to show the arrangement with out-of-state charities or organizations. We find no merit to the Taxpayers' argument on this issue.

### B. Non-Business Income

¶34. Billy also argues he offered proof to show the MDOR improperly included certain non-business income in its sales tax assessment. Billy testified that he maintained an "emergency fund" of cash at his house comprised only of personal funds. At trial, a few bank statements were introduced that Billy claims showed proof of deposits into his business account of nontaxable cash from his emergency fund and credit-card advances used to cover business costs. However, Billy provided no documentation to corroborate his testimony about the source of the cash he was depositing in his business account. Thus, the personal cash deposits could not be differentiated from the sales deposits. Similarly, Billy failed to provide any credit-card statements that would show the cash advances deposited in his business account. Moreover, the Taxpayers did not provide evidence that these deposits were included in the sales tax assessments and had not been already removed by the auditor. Billy's uncorroborated testimony about this income failed to overcome the presumption of correctness about the tax assessments.

### IV. The chancellor properly affirmed the assessment of penalties and interest.

¶35. The Taxpayers claim that the chancery court erred in affirming the penalties and interest assessed by the MDOR. They complain that the chancery court failed to

18

"meaningfully address" the matter in its ruling.  We are not persuaded by this argument.

¶36.    Penalties and interest against the taxpayer are based on statute.  The MDOR is authorized to assess penalties and interest for sales tax assessments:

> *If any part of the deficient or delinquent tax is due to negligence or failure to comply with the provisions of this chapter or authorized rules and regulations promulgated under the provisions of this chapter without intent to defraud,* there may be added as damages ten percent (10%) of the total amount of deficiency or delinquency in the tax, or interest at the rate of one percent (1%) per month, except as otherwise provided in this section, or both, from the date such tax was due until paid, and the tax, damages and interest shall become payable upon notice and demand by the commissioner.

Miss. Code Ann. § 27-65-39 (Rev. 2024) (emphasis added).  Likewise, the MDOR is allowed to assess penalties and interest for failure to pay income tax:

> In case of failure to pay the amount shown as tax on any return specified in subsections (1) and (2) of this section on or before the date prescribed for payment of the tax, determined with regard to any extension of time for payment or installment agreement, or both, *there may be added* to the amount shown as tax on the return one-half of one percent (½ of 1%) of the total amount of the deficiency or delinquency of the tax if the failure is for not more than one (1) month, with an additional one-half of one percent (½ of 1%) for each additional month or fraction thereof during which the failure continues, not to exceed twenty-five percent (25%) in the aggregate.

Miss. Code Ann. § 27-7-53(5) (Rev. 2017) (emphasis added).[12]   These statutes clearly provide that the MDOR commissioner has the discretion to assess penalties and interest on sales and individual income tax assessments when certain conditions are met.  Finally, on

---

[12]  For interest rates charged on deficient or delinquent sales tax assessments on or after January 1, 2018, see section 27-65-39(d).  For the interest rate on deficient or delinquent income tax assessments on or after January 1, 2018, see section 27-7-53(3)(b)(iv).

19

appeal, the chancery court has the same authority and discretion as the commissioner to impose penalties and interest:

> Interest and penalty included in this determination shall be computed by the court based on the methods for computing penalty and interest as specified by law for the type of tax in issue, *and the court shall have the same discretion as the commissioner in determining whether and to what extent such amounts are warranted under the facts of the case.*

Miss. Code Ann. § 27-77-7(5) (emphasis added).

¶37. The Taxpayers claim that neither the MDOR nor the chancery court provided sufficient reasons to warrant the imposition of penalties and interest on their sales and income tax assessments. They argue that at trial, the MDOR failed to address the matter, and the chancery court's ruling was not supported by substantial evidence. The Taxpayers claim the chancellor appeared to "uphold penalties and interest across the board simply because he was unpersuaded that [the] . . . Parrott[s'] yard sales were not isolated, casual and occasional sales." They argue at length that the assessments of penalties and interest are not mandatory but discretionary.

¶38. The chancery court's judgment stated that "the evidence presented by the [Taxpayers] at trial does not establish that penalties and interest were improperly assessed or that any reduction in said penalties and interest is warranted in this matter." In his bench ruling, the chancellor specifically addressed the matter:

> Initially, I had placed in my mind dealing with penalties and interest, the fact that an inquiry had been made of the Department, but I find that generally the advice will not eliminate the tax liability, but it may eliminate the penalties, but not interest. But I don't find that to be the case here because the way he

20

conducted his business goes beyond what should be or in my mind - - unless he accurately described how he conducted his business, which he did not, merely using the term "yard sales," this goes beyond a yard sale. It's not sold at a yard. It was sold on Lemoyne in front of a storage facility. . . .

This finding relates to an earlier finding the chancellor made regarding the nature of the Taxpayers' sales of personal property going "beyond what I commonly understand a yard sale to be. This is clearly a substantial operation. It requires a lot of time and management skills. . . ." The chancellor's ruling indicated that he found the Taxpayers "failed to comply" with the tax statutes by calling their business something the facts indicated it was not, a "yard sale."

¶39. Under section 27-77-7, the chancellor has the same statutory authority as the commission to impose penalties and interest. The court made a specific ruling based on substantial evidence. We find no error.

## CONCLUSION

¶40. For the forgoing reasons, we affirm the chancery court's dismissal of the Taxpayers' petition with prejudice.

¶41. **AFFIRMED.**

**CARLTON AND WILSON, P.JJ., WESTBROOKS, McDONALD, LAWRENCE, McCARTY, EMFINGER, WEDDLE AND ST. PÉ, JJ., CONCUR.**

21